## FOX et al. v. MILLER.

### No. 11649.

Court of Civil Appeals of Texas.
San Antonio.

Dec. 11, 1946.

Rehearing Denied Jan. 15, 1947.

Taylor, Cox, Wagner & Taylor, of Brownsville, and Sid L. Hardin, of Edinburg, for appellants.

Carter & Stiernberg and John F. Whitelaw, all of Harlingten, for appellee.

MURRAY, Justice.

This suit was instituted by Sam D. Fox, A. K. Polis and C. O. Hagan against S. L. Miller to recover large sums of money that plaintiffs claimed they were induced, by fraudulent representations and promises of the defendant, S. L. Miller, to pay out in connection with a business venture in Old Mexico.

The trial began to a jury, but upon the completion of the testimony the trial judge took the cause from the jury and rendered judgment that plaintiffs take nothing, without prejudice to their right to one for an accounting. From that judgment plaintiffs below have prosecuted this appeal.

The entire case turns on whether or not there were fact issues raised by the evidence which should have been submitted to the jury. A full statement of the case will be helpful:

S. L. Miller met A. K. Polis in McAllen, Texas, some time prior to February, 1943. Appellee mentioned to Polis that he knew of a magnificent timber tract in the interior of Mexico, that he thought some money could be made from if an experienced lumber man could be found to operate it. Appellant Polis said he knew such a lumber man in East Texas, whose name was Sam Fox. Fox had been in the lumber business all his life and appellants Polis and Hagan were interested in lumber by reason of the fact that they were large produce shippers requiring many boxes and containers made of lumber. As a result of this conversation, Polis brought Sam Fox to McAllen and introduced him to Sam Miller. Miller, Lee Green, Marko Dizdar and Bert Blair were in the act of leaving by auto for the interior of Mexico. Fox decided at once to go with them. They ultimately arrived in Durango, Mexico. Miller introduced Fox to an engineer by the name of Frank Acevedo and the two went to El Salto to look at certain timber lands. Miller and the other members of the party had other business to attend to. A few days later, on February 27, 1943, Sam Fox signed an agreement with Frank Acevedo for the purchase of fifty million feet of lumber and paid him $4,000 on the contract. Fox did this on the representation by Miller that Acevedo was thoroughly trustworthy and a good friend of his. Green and Dizdar contracted to purchase a 64,000 acre ranch, and on the way back Fox agreed to let Green and Dizdar in on the lumber deal if they would let him in on the ranch, which was agreed. After returning to Texas Fox, Miller and Polis had a conference about the lumber deal. Fox stated he could obtain a sawmill to manufacture lumber and could operate it if the necessary permits to export the mill into Mexico and the necessary permits to operate it there and ship the lumber to the United States, could be obtained. Miller assured Fox that he was well acquainted in Mexico, had a lot of pull there and could attend to everything south of the border.

About a month later, appellants, appellee and a large group of people made a second trip to Durango. Appellants went on this trip for the purpose of inspecting the timber land upon which they were to operate. When they arrived they learned that one Silva and two of his body guards had been assassinated near these timber lands. Silva was one of the officials with whom they were to deal in securing concessions to cut timber from these lands. Miller suggested it might be dangerous to go out on these timber lands due to the excitement caused by Silva's assassination, so they returned to Texas without making an inspection of the lands. Fox had made a very limited inspection on his first trip.

Subsequently, Fox, Polis, Hagan, Miller, Chrest Thompson and Lee Green agreed to go into this lumber transaction. Miller agreed to organize a corporation in Mexico for the purpose of carrying on this lumber business under the name of "Compania Maderera de Texanos, S. A. de C. V." Miller was to have half the stock. The corporation was to acquire certain concessions in the vicinity of El Salto, Mexico, to exploit lumber, as well as to acquire the 64,000 acre ranch in Mexico. Fox left for East Texas, where he found a secondhand sawmill for sale, and which was purchased for the benefit of the venture. Fox had it dismantled and Sam Miller obtained the export permits from the United States Government, and the mill was exported through Laredo in July, 1943, and subsequently arrived at El Salto in Mexico. Lee Green and Chrest Thompson, who had subscribed $17,500.00 to the Mexico Corporation, became dissatisfied and demanded the return of their subscription before they would permit the mill to go into Mexico. Miller induced appellants to put up this sum of $17,000.00 to reimburse Green and Thompson. He represented that the Corporation had $15,000.00 in the bank in Mexico and that as soon as he could contact one Joe Pate he would bring this amount back from Mexico and repay appellants. That the capital stock of the corporation could be reduced from its original capitalization of $70,000.00 by this amount. Fox employed one W. A. Tarver, who was an experienced sawmill man, to go down to El Salto, Mexico, and set up the

sawmill. Tarver could not find a level tract of land on which to set up the mill, and, consequently, it was never set up and has never manufactured any lumber. The sawmill was a large one and required some sixty acres of level land for its operation, together with fifteen acres for a lumber yard. The timber was in a mountainous country and there was no level land in sufficient size near the timber upon which the mill could be placed. It was not practicable to place the mill too far from the timber.

On August 18, 1943, Tarver returned from Mexico to Edinburg, Texas, and reported these facts to Miller, Polis and Hagan. They all then and there agreed (Polis and Hagan acting for Fox) to liquidate the matter and to share whatever profits or losses there might be. They agreed not to spend any more money, except for a caretaker of the mill at El Salto.

On December 10, 1944, appellants and appellee had a conference in Edinburg and appellants demanded to know of appellee what had become of their money. Appellants had been rendered statements by appellee which they considered unsatisfactory. This was a long harassing, vociferous conference, in which violent abusive language was used. Miller finally told them, in answer to their demands for a statement of what had become of their money: "You boys are young, and you have got some experience. Mark it off on your cuff so you will not forget it. It will be worth a whole lot to you later on."

Fox then told Miller he was going to sue him; that he had picked the wrong three boys; and gave instructions to his lawyer to file suit. Miller then told appellants that there was not any corporation, there was not any stock, there never were any concessions, there were not intended to be.

■ We sustain appellee's first counter-proposition, to the effect that appellants and appellee, after full knowledge of all the facts and circumstances in connection with this transaction, entered into a new agreement on August 18, 1943, with reference to the subject matter thereof, to liquidate it and share all profits or losses as the case might be, and that this liquidation agreement was partially performed, and by entering into such agreement appellants waived any right to either rescission or damages for fraud.

There can be no doubt but that appellants had full knowledge of all the facts that had transpired with reference to this matter at the time they made the new agreement to liquidate the entire matter and accept their profit or loss. They knew the Mexican corporation had not been organized, they knew that the permits and concessions had not been obtained, they knew that the sawmill could not properly. be set up. They knew that the $15,000.00 had not been brought back to the United States. With all this knowledge they entered into a new contract concerning the entire transaction. Thus they waived their right to rescission and to recover damages for the fraud. Thompson v. Pitts, Tex.Civ.App., 2 S.W.2d 899; Phillips Petroleum Co. v. Rau Construction Co., 8 Cir., 130 F.2d 499; Risley v. McAdams, Tex.Civ.App., 108 S.W.2d 443; Santa Ana Citrus Groves, Inc., v. First National Bank of Chicago, Tex.Civ.App., 149 S.W.2d 310; Braxton v. Haney, Tex.Civ.App., 82 S.W.2d 984; 20 Tex.Jur. 110, § 73.

Appellants contend, however, that they did not have "full knowledge" of the fraud at the time they entered into the liquidation' agreement on August 18, 1943, because at that time Miller had not admitted to them that he had never intended to organize the Mexican Corporation and that he had never intended to get the concessions and permits and to do the other things which he had promised to do. We cannot sustain this contention. Appellants had full knowledge of each and every material fact with reference to this transaction which they now know, at the time they entered into the new agreement. Waggoner v. Zundelowitz, Tex. Com.App., 231 S.W. 721; 20 Tex.Jur. 110.

■ "Full knowledge" does not, however, mean that the party must have notice of other than the material facts before he can be held to have waived fraud. 20 Tex. Jur. p. 110, § 72.

"Full knowledge" of a fraud does not mean that the party defrauded shall have knowledge of all the evidence tending to prove the fraud. Waggoner v. Zundelowitz, Tex.Com.App., 231 S.W. 721.

■■ There is another reason why we think the trial court did not err in taking the case from the jury and rendering judgment for defendant. The record unquestionably shows that Miller did secure the permit for the exporting of the sawmill to Mexico, that he did secure the concessions to exploit the timber lands for the production of lumber and that appellants afterwards joined in the transfer of these concessions to one Flinn. It is true that he did not organize the corporation, but when it was discovered that there was no place suitable to erect the sawmill it became immaterial whether there was a corporation or not. It is also true that he failed to get a permit to do business in Mexico, but there is no competent evidence in the record showing that such was required under the laws of Mexico. In other words, the record shows that the sole cause of abandoning the lumber adventure was that Fox did not procure the right kind of sawmill to produce lumber in a mountainous country. Furthermore, all of the promises made by Miller were to do certain things in the future which will not ordinarily support a suit for fraud.